UNITED STATES DISTRICT COURT

for the

Southern District of Florida

Miami Division

FILED BY _____

JAN 0 7 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

|  |  |
|---|---|
|  | Case No. |
| LINA M GONZALEZ DE LA PAVA, ) | |
| et al., ) | |
| 110 Zamora Ave, # 2 ) | |
| Coral Gables, FL 33134 ) | |
| ) | |
| *Plaintiff* ) | |
| ) | **COMPLAINT** |
| vs. ) | **JURY TRIAL REQUESTED** |
| ) | |
| LATAM AIRLINES GROUP S.A., ) | |
| LAN CARGO S.A., ) | |
| et al., ) | **INJUNCTIVE RELIEF SOUGHT** |
| 6500 NW 22nd Street ) | |
| Miami, FL 33131 ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

**NATURE OF ACTION**

This is an action under Title VII of the Civil Rights Act of 1964, as amended, by the

Pregnancy Discrimination Act of 1978, and Title I of the Civil Rights Act of 1991, to correct

unlawful employment practices on the basis of sex (female) and to provide appropriate relief to

the Charging Party Lina M. Gonzalez De La Pava, who is a member of the protected Class and

who is adversely affected by such practices.

Introduction

Plaintiff Lina M. Gonzalez De La Pava on behalf of herself and women similarly situated

at LATAM Airlines in the offices located at the Miami Airport alleges that Defendant, LATAM

AIRLINES GROUP, S.A. ("LATAM Airlines"), discriminated against her because of her

pregnancy, a condition of her sex (female), retaliated against her for complaining about the

discrimination, and constructively discharged her by (1) devising a letter threatening her future

employment with the company (without the existence of a physical negative performance

evaluation at the time of its creation, as shown by evidence provided to the company),

(2) creating a fraudulent performance evaluation, after the fact, to support their intention to

terminate based on pregnancy and sex as shown by the false allegations contained therein that

originated and were perpetrated by male members of the team, all of which associated with a

pornographic image of two men in team chats that promoted Management's preference for male

employees known as #bros and influenced their discrimination against women, (3) creating a

hostile environment by maintaining the threat of termination after being shown the evidence

refuting the false allegations which they knowingly understood as false as shown in their

experienced from her home in Miami-Dade County. While working from home in Miami-Dade County, Charging Party was forced to resign from LATAM AIRLINES.

**PARTIES**

4.      Plaintiff Lina M Gonzalez De La Pava, Pro Se, is expressly authorized to bring this action by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17, and has been issued a Right to Sue letter by the Equal Employment Opportunity Commission.

5.      Defendant LATAM AIRLINES is registered to do business in Florida, has continuously done business in Florida, and at all relevant times, employed at least fifteen employees.

6.      At all relevant times, LATAM AIRLINES has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

**CONDITIONS PRECEDENT**

7.      More than thirty days prior to the institution of this lawsuit, Mrs. Gonzalez filed a Charge of Discrimination with the Florida Commission on Human Relations which was subsequently transferred to the Equal Employment Opportunity Commission alleging that LATAM AIRLINES violated Title VII (Exhibits #1.2, 1.3).

8.      The Equal Employment Opportunity Commission issued a Right to Sue Letter on October 7, 2021, determining that it was unlikely they would be able to complete its administrative processing within 180 days of the filing of the charge, (Case #15D-2021-00781; Exhibit #1.1).

9.      Prior to initiating this lawsuit, Ms. Gonzalez attempted to work with an internal investigation at LATAM AIRLINES, and it's Human Resources Department, (despite the unlawful employment practices alleged herein) through informal methods of conference,

persuasion, and evidence to remedy the discriminatory practices and continue her employment with the company. LATAM Airlines however refused to provide a copy of the documentation of their internal investigation (Exhibit #2).

10.     All conditions precedent to the institution of this lawsuit have been fulfilled under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17.

## STATEMENT OF FACTS

11.     LATAM Airlines Group S.A. is an airline holding company headquartered in Santiago, Chile. It's U.S. offices are located at 6500 NW 22nd Street, Miami, FL 33131. It is considered the largest airline in Latin America, with international operations within Latin America, Europe, the US, and the Caribbean.

12.     LATAM AIRLINES employs approximately 28,400 people in Latin America, Europe, and the U.S. and approximately six hundred people in Miami, Florida, approximately 25% of whom are women.

13.     I, Lina M Gonzalez De La Pava, began working for Professional Airline Services, Inc., a subsidiary of LATAM AIRLINES GROUP S.A., as per company records, on March 29, 2007, taking care of walk-in customers at its Export office at Miami International Airport (Exhibit #3).

14.     On July 1st, 2016, I was promoted to Coordinator/Jr Revenue Management Analyst, when I had no children, under LATAM AIRLINES Group S.A.'s subsidiary LATAM Cargo, otherwise known as LAN Cargo S.A. This was a night shift position. I was afforded seniority for the years worked under Professional Airline Services, Inc (Exhibit 4). During this time, I witnessed how a daytime Revenue Management Analyst, *Ingrid Gomez*, was with small child and was forced to resign because of a schedule change that made it impossible for her to

pick up her child from daycare before its closing hours. I also witnessed the schedule being changed back to normal hours after she quit.

15.     In March of 2019, I was promoted to Revenue Management Analyst after the birth of my first child, under the tenure of a new Vice President of Revenue Management, Gudny Genkowsky, who also hired Milagros Pena to the Revenue Management Analyst position and promoted Jaime Garcia to Manager of Revenue Management.

16.     As far back as February 13th, 2020, after the tenure of Gudny Genkowsky, and her leaving to work in Europe, I discovered the use of a male pornographic image that senior management circulated. It is apparent that team manager Jaime Garcia promoted and abetted this behavior under the meme #bros (Exhibits #5,6,7,8,9,10,11,12,13). This behavior continued under the tenure and with the knowledge of the new Vice President of Revenue Management - Pedro Mones, and the subsequent Vice President of Revenue Management - Merly Aguilar (Exhibit #12).

17.     On March 16, 2020, LATAM staff was requested to work from home if they were able to do so, as a result of the covid pandemic. I started working from home at this time (Exhibit #14).

18.     On March 18, 2020, LATAM announced that members of the company would have their salaries reduced by 50% for the months of April 2020 through June 2020, in order to prevent reductions in staff  (Exhibit #15).

19.     In April of 2020, LATAM employees received offers of an employee buyout program.

20.     On April 28, 2020, I reached out to Maria Martinez of  Human Resources to inquire about the Employee Buyout Program being offered to employees with seniority (Exhibit #3). It was confirmed by her that it would allow me to receive $40,590.00 + vacation and sick

days. I was not aware of any danger to my employment (nor the discrimination based on my pregnancy), so I decided not to submit a request to take part in the Employee Buyout Program.

21.     On May 15th, 2020, Milagros Pena, (who was hired under the tenure of Gudny Genkowsky), also a female employee with small children, complained during a team meeting about male members of the team not doing their job (Exhibits #16, 17). Management, under Jaime Garcia, regularly blamed errors by men (who associated with the men only #bros meme), on female members of the team. Milagros Pena was fired that same day under the pretext of covid pandemic downsizing, although the company offered a 50% companywide salary reduction to preserve everyone's employment (Exhibits #15, 18, 19).

22.     On July 28th, 2020, I suggested that our team take advantage of the new sexual harassment training that was available. Male managers in Miami allowed it to be taken lightly by male members of the team. This group of male employees and managers shared an association with the **#bros** meme. (Exhibits #20, 21, 22, 23, 24, 25, 26).

23.     On August 14th, 2020, two male members of the team (who associated with the #bros meme), failed to fulfill their job duties. I pointed it out in an internal company WhatsApp chat, and nothing was done to address the problem (Exhibit #27).

24.     On August 19, 2020, I was given my intermediate 2020 performance evaluation, with no issues to report, which was consistent with no issues of any kind in my previous 13 years with the company (Exhibits #28, 29, 30).

25.     On September 1st, 2020, I notified both Rodrigo Rivera, at the time Jaime Garcia's assistant, and Jaime Garcia, that I was pregnant with my second child. Rodrigo Rivera reminded me that he was not the team manager, and to let Mr Garcia know of my pregnancy (Exhibit #31). A week later, in a team meeting, after having supplied the information in

confidence to Rodrigo Rivera and Jaime Garcia, I was asked how many children I planned to have by a male member of the team who associated with the #bros meme, Antonio Veliz, and I answered that my husband wanted four.

26.     On September 11, 2020, I was verbally attacked an embarrassed in a team meeting by Rodrigo Rivera. I called Jaime Garcia to request oversight and assistance, but nothing was done. Even though this event was hostile in nature, it did not impact my ability to work for the company, and I unfortunately did not submit an official complaint verbally or in writing for fear of retaliation as had happened to other women in the company.

27.     On November 4, 2020, Gonzalo Covos - a new male employee with no prior experience – was hired to replace Milagros Pena, (another woman fired for similar reasons as I was), was introduced to the team chat by team manager Jaime Garcia. Jaime Garcia, then requested that male team member, Antonio Veliz, ( another male employee who was associated with the #bros image), post the picture of the #bros meme to the team chat (Exhibit #13). Thus, the Team Manager had also participated in #bros meme and the hiring of the lesser qualified Gonzalo Covos to the #bros group. Milagros Pena, ( a fully qualified individual) was actively seeking reemployment into company at this time only to have her application ignored. She had been discharged under the pretext of covid downsizing but denied all attempts to take back her position in the company (Exhibits #33, 34). The management claimed downsizing to a female employee and hired a lesser qualified male employee.

28.     On February 2, 2021, Rodrigo Rivera, who functioned as a proxy for Jaime Garcia, posted a video in one of the team chats referring to women as vaginas (or vulvas), (Exhibits 23, 24). Jaime Garcia or Vice President of Revenue Management Merly Aguilar did not address this. My lack of knowledge of Milagros Pena's attempts to be rehired after her

termination, and the future attempts by management to get rid of me, as the only woman with small children left in the team, did not alert me to report the incidence in writing at the time.

29.     On March 10, 2021, a letter was formulated I believe by these male managers and signed by Jacqueline Fuentes of Human Resources advising me that my job was in jeopardy (Exhibit #35). This was written without the use of, or results of, the 2020 final performance evaluation nor the 13 years of satisfactory performance. I know this because one of the false allegations against me in the evaluation was perpetrated by a male member of the team, Alejandro Escudero, (who is associated with the #bros meme), on March 17th, 2021 (Exhibits #36, 37). This letter was written before the event that transpired on March 17th, 2021. I could only conclude that Human Resources cooperated or looked the other way, with the male managers to when the letter was written. Apparently, the letter was formulated before my performance evaluation that it was supposed to be based on. However, it was emailed to me on the afternoon of March 29, 2021.

30.     On March 24, 2021, I reached out to Jaime Garcia to ask him for some time over the phone to report several incidences of male employees not doing their jobs and having to fix the issues caused by them because of it (Exhibit 32). The request was ignored.

31.     On March 26, 2021, team manager Jaime Garcia, Rodrigo Rivera, and others, took part in the mockery of a male employee in the Warehouse department, Geomar Delgado, by referring to him as a female because they thought he should not be a part of the company (Exhibit 25). This happened again on April 19, 2021 (Exhibit #26).

32.     On March 29, 2021, the final 2020 Performance Evaluation was given to me by Rodrigo Rivera, who was not a manager of the team (Exhibit #31), or in my organizational structure (Exhibit #38), in the presence of Isabel Zuluaga of Human Resources. This was rife with false allegations and no mention of goals achieved, which was half the weight of the

evaluation score totals (Exhibits #30, 39, 40). Later I found out via evaluation records that Jaime Garcia, (the true Manager for evaluation purposes who was not present for the evaluation meeting), fraudulently signed the evaluation (Exhibit #41). However, Jaime Garcia was privy to evidence that would have exonerated me from several of the false allegations (via his proxy Rodrigo Rivera and internal communications), and the missing goals achieved (Exhibit #40). After the performance evaluation meeting I received the letter from Human Resources dated March 10th, 2021, by email threatening the loss of my employment unless I improved upon the false allegations Contained. Moreover, I had no notice that I would be penalized by the false and fraudulent performance evaluation.

33.     On April 1st, 2020, I sent an Official Complaint Letter created March 29th, 2021, in response to the performance evaluation via email (Exhibits #41, 42).

34.     On April 2nd, 2021 (Retaliation #1) I was again subjected the embarrassment and retaliation by Rodrigo Rivera, who sent a barrage of harassing questions my way, knowing full well the system was down, and I could not answer. This created the impression that I was not up to the task. This happened in front of all team members and other areas of business that get together with Revenue Management in team meetings. This was done to belittle and try to push a false narrative (that I did not know how to run the operation). Another email was sent by me, on April 4th, 2021, to human resources to report the occurrence of retaliation (Exhibit #42).

35.     On April 05, 2021, Jacqueline Fuentes reached out from Human Resources via chat to speak to me about the occurrence. She gave me her phone number to call and talk (Exhibit #43). The result was Jacqueline Fuentes telling me to report any other occurrences of retaliation if they took place again. I believe she just looked the other way to protect these managers and her own job. Afterall she is a female employee with little to no redress available.

36.     On April 15, 2021, a meeting was held with Isabel Zuluaga, Jaime Garcia, and Merly Aguilar in which they reinforced the idea that there was nothing wrong with the performance evaluation that I had objected to and that I did not accept my constructive criticism. It was stated the score would not change on the evaluation because - even though the examples used in the proficiencies used to score the evaluation were incorrect and were not applicable to me, other examples could be used to keep the score the same. However, no other examples were provided. I stated respectfully but emphatically that I did not agree with the results of the performance evaluation or the allegations therein (Exhibit #44).

37.     On April 21, 2021, I gave birth via C-Section and went on parental leave.

38.     On May 19, 2021, I submitted my first request for a written response about the official complaint letter I had previously submitted to Human Resources (Exhibit #44). Human Resources did not respond.

39.     On June 02, 2021, I submitted my second request for a written response (Exhibit #45). Again, Human Resources did not respond.

40.     On June 03, 2021, Isabel Zuluaga finally responded to my previous email saying an internal review had taken place and continued to state she would get back to me to follow up (Exhibit #46).

41.     On June 08, 2021, Isabel Zuluaga emailed me again to mention she wanted to schedule another meeting via Google Meet. Again, there was no acknowledgement of my request for a written response (Exhibit #47).

42.     On June 15, 2021, I submitted my third request for a written response (Exhibit #48).

43.    On June 16, 2021, I returned to work for one day to break my FMLA time off and took my scheduled Paid Time Off (PTO) on June 17th, 2021, through July 23rd, 2021, to continue to take care of my baby.

44.    On June 18, 2021, Isabel Zuluaga sent a message (with a five day expiration date, obviously to avoid creating a record) while I was on Paid Time Off. This was in response to my insistence for a written response. In this email she stated she would like to propose a meeting with me when I came back from PTO at the end of July. The email was set to expire after 5 days; however, I was able to take a screenshot before the message was no longer available (Exhibit #49). Had I not been paying attention to correspondence while on PTO, I would have missed it. This was in response to the email I sent while on FMLA and seemed hostile.

45.    On June 18, 2021, the same day Isabel Zuluaga of Human Resources sent the disappearing email; my position was advertised by Human Resources in an internal company email for those interested in applying (Exhibit #50).

46.    On July 13, 2021, I submitted my fourth request for a written response (Exhibit #51).

47.    On July 23, 2021, Isabel Zuluaga sent me a written response stating that they found no bad faith involved in the performance evaluation and that, however, Alan Fridman would contact me of LATAM Chile (Senior Manager of Personnel and Vice President of Personnel), to conduct an internal investigation, even though she had stated previously an internal review had already taken place (Exhibits #46, 52).

48.    On July 25, 2021, I responded by stating my willingness to cooperate with the internal investigation (Exhibit #53).

49.    On July 26, 2021, (Retaliation #2) when I returned to work, management continued their campaign in retaliation against me. I was excluded from specific and required

training and I was only scheduled for 4 days of retraining in operation critical programs- all in PAX1 and (PAX2/PAX3). After an 8 month gap of Maternity Leave and PTO, I was not fully trained on a new system that had considerably changed. It had just come online for regular use while I was away on parental leave. My retraining was missing the most difficult of operations – (CAO1 and CAO2), meaning I was expected to perform to standard without being fully retrained in the different methods of accessing the data necessary for the more complex responsibilities of CAO1 and CAO2. Yet, I was also scheduled to work the CAO3 shift on July 30th 2021 without any retraining even though there were system changes and most importantly - the operation's responsibilities and tasks had changed. This act assured me a 100% chance of failure that management could later choose to use as evidence to discharge me from the company as threatened by their letter dated March 10th, 2021, and written by Jaqueline Fuentes of Human Resources (Exhibits #54, 55).

50.     (Retaliation #3) When Bringing up the matter in the morning of July 26, 2021, manager Jaime Garcia told me, that I did not need to be retrained in the shifts and that the training that had been scheduled was just to re-familiarize myself with the system (Exhibit 55). I learned the information Jaime Garcia had given me was false after one of my coworkers advised me that the CAO3 shift responsibilities and operation had changed (Exhibit 54). I also intuitively knew that, without fully retraining in the different methods of accessing the data necessary for the more complex responsibilities of CAO1 and CAO2, I was being set up to fail. Rodrigo Rivera stepped in to say that if I needed more retraining to let them know during the week. However, I was already scheduled to work the CAO3 shift as soon as I finished my four day Pax1 and PAX2/PAX3 retraining. This lie and effort to set me up to fail constituted retaliation #3. That same day I sent an email to my manager Jaime Garcia requesting a retraining schedule change to accommodate all retraining needed to perform to the standard of every other member

of the team, he responded the following day by changing the schedule to show 1 day retraining for each shift but doubled down on his efforts by continuing to add another form of retaliation.

51.     On July 27, 2021, (Retaliation #4) management decided to add one extra night to my already excessive 3 night shift schedule constituting in retaliation #4, making it four back to back night shifts in the month (Exhibits #55, 56, 57), while everyone else in the team was scheduled for 2 nights (with the exception of Walter Segarra who only worked nights). The extra night shift was not scheduling me with the responsibilities of a night shift analyst - it was scheduling me to shadow the analyst on duty, serving no purpose but to punish me for altering their plans, as this had no value in retraining me in the different methods of accessing the data necessary for the responsibilities of CAO1 and CAO2 . This scheduling caused me to have to go to my OB/GYN and emergency room the day following the four back to back nights in August 09, 2021 (Exhibits #58, 59).

52.     On August 01, 2021, I submitted a fifth request for a written response and reported the retaliations that had taken place, including the scheduling of the extra night, now totaling four straight back to back nights,  however, this was, again, ignored by Human Resources (Exhibits #55, 58, 59). Even though the hostility against me was exhausting, I continued to press on because I needed the job. Human Resources chose to ignore my claims of retaliation. At this time, it was known to Management, (male managers) that I was Postpartum, and the stress resulted in my urgent visit to the OBGYN and hospital Emergency Room.

53.     On August 02, 2021, (Retaliation #5) I sent Jaime Garcia a another request for additional retraining on the new system for CAO1 and CAO2 shifts, because the time allotted had not been enough (Exhibit #60), also reminding him that one of my male coworkers, Ignacio Alvares Briones (who also associated with the #bros image), had been afforded retraining

in CAO1, CAO2, and PAX for a total of 7 days after a 7 month gap of not using the old system (Exhibit #61), while I had an 8 month gap with the new one. Jaime Garcia responded that he did not understand the comparison with Ignacio Alvares Briones but that he would copy Rodrigo Rivera to coordinate. Rodrigo Rivera responded by sending an email saying that Ignacio Alvares Briones did not have daytime experience in those shifts, and it was the reason he had been given those days (Exhibit #62). This constituted retaliation #5. It was another attempt to set me up to fail. I asked him to remember that Ignacio Alvares did perform daytime shifts (during his 2 week training in the legacy system), and that he was also trained as a daytime analyst with, among others, Ana Maria Ramirez, who, while with the team, only worked daytime shifts. I also reminded him that Ignacio also used the same legacy system for a long period of time before going off to training with the Restart Program. The situations were similar in that he needed to understand the different methods of accessing the data from the system after a 7 month gap in using it (after which he received 7 days of retraining in the legacy system), just as I needed to have knowledge of these after an 8 month gap, and my situation was more precarious because I only had a 4 day training course on the system 8 months gap prior without any extended use of the system.

54.      On August 03, 2021, I was given one additional day for CAO1 and one additional day for CAO2. It was not the total 3 days I requested, and it was not equivalent to the time Ignacio Alvares Briones had been given, but it was an improvement, and I did not press the matter any further.

55.      On August 05, 06, 07 and 08, 2021, I ended up working the four straight back to back night shifts interfering with the care of my new baby and I had reported this issue to Human Resources a week earlier, which again they ignored.

56.     On August 09, 2021, I had to visit my OBGYN who referred me to the
Emergency Room due to a sharp pain in the abdomen in the area of the c-section from which I
was still healing. I was sent to West Kendall Baptist Emergency where they continued to
run tests and diagnostics. I left the hospital past midnight because the hospital was full to over
capacity with patients suffering from Covid 19. The ER doctor stated in his Final Report that I
should avoid overnight work until symptoms improved and I be evaluated by my outpatient
PCP/OB/GYN (Exhibits #58, 59).

57.     On August 11, 2021, (Retaliation #6) in preparation for my interview with
Internal Investigator Alan Fridman, I reached out to Isabel Zuluaga of Human Resources by
phone to request a copy of the contract I signed. I requested this in order to provide to Alan
Fridman who I was meeting on 08-13-2021 via Google Meet to assist with the investigation. I
was told that I signed a work offer by Isabel Zuluaga, who then asked Maria Jimena Paredes
Cucalon to send me the work offer I signed (Exhibit #63). Maria Jimena sent me a 2016 work
offer signed for my previous position as Coordinator/Jr Revenue Analyst (Exhibit #4, 64), but
I was requesting the one I signed in early 2019 upon accepting the role of Revenue Management
Analyst. As a result, I sent Maria Jimena Paredes Cucalon a chat message to advise her that I
received the wrong one (Exhibit #65). After 2:01PM on Wednesday 08-11-2021 there was no
response to the chat (Exhibit #66), even though I advised I needed this for the investigation on
Friday, 08-13-2021. I followed up later that night via email (Exhibit #67), requesting a
reconstruction of the contents of the work offer signed if they could not find the one for 2019.
Even though Ms. Paredes Cucalon was working at the time I sent her the chat, all subsequent
requests for the document from any and all members of Human Resources went unanswered
until 5:01 PM on Thursday August 12th, 2021(Exhibit #68). In an email that Thursday 08-12-
2021 at 5:01PM, after operating hours for Human Resources Gabriela Maria Patino Varela,

responded without the copy of the signed document, and without the reconstruction of the document's contents, needed to provide to Mr Fridman. This was a sixth act of retaliation. There was no other reason to delay an answer until after working hours. It was too late to be able to reach out to her to request the information needed in the email again. This act withheld critical information and evidence necessary to the investigation by Mr Fridman, and in doing so was another case of harassment and intimidation by Human Resources, as they had done continuously to increase the emotional and psychological toll on me.

58.     On August 13, 2021, I met with Alan Fridman, internal investigator for LATAM, via Google meet. I emailed him a letter providing evidence of support (Exhibit #69). I also went over the letter with him, answering all questions asked, with hopes that in presenting all the evidence there would be some resolution.

59. On August 22, 2021, I sent a follow-up email to the interview with Alan Fridman where I sent evidence of the mid-year 2020 evaluation having had no issues, and also evidence of when it happened in 2020 (Exhibits #28, 29).

60.     On August 24, 2021, I received and submitted a note from the OBGYN advising that I should not be working night shifts for the following two months (Exhibit #59). This was in response to the act of retaliation in the scheduling I was placed under where I had to work four straight nights, (while all other daytime workers like myself were only scheduled for 2), resulting in my visit to the OBGYN and Emergency Room the day after the four back to back nights.

61.     On September 01, 2021, (Retaliation #7) I requested the results of the internal investigation in an email to Alan Fridman and he responded by saying that after a few more interviews he would turn in the results to the legal team (Exhibit #2). This ran contrary to what I had been told by Isabel Zuluaga of Human Resources about the investigation (Exhibit #52).

Because of his position as Vice President of Personnel it means this was a policy action of retaliation from the top of the company in coordination with the legal department.

62.     By the week of September 07, 2021, (In Continuation of Retaliation #7) the internal investigation had been turned over to the Legal Department, (Exhibit #2). I submitted a letter by email requesting the internal investigation be provided to me because no one had reached out to advise me of the results (Exhibit #70), and to report further acts of hostility that had taken place since the investigation took place. I believe that no one in the company had any intention of providing me with the results of the internal investigation. I believe they lied about the reason for the investigation and chose to use it as a fact finding endeavor to see how much evidence I had of the discrimination against me and to string me along so that they could finish their bankruptcy proceedings without any talk of the discrimination taking place.

63.     On September 10, 2021, I contacted a mental health professional that my insurance would cover to schedule an appointment as soon as possible as the environment had become toxic for my mental health and intolerable. It got scheduled for Tuesday September 14, 2021 (Exhibit 71).

64.     On September 13, 2021, (Retaliation #8) a new schedule was revealed that made it impossible for employees to pick up their children from daycare, before they closed, on the days they were scheduled for "West" shifts which were up to now called PAX2 (Exhibit #72). Please keep in mind that the team had been working with no issues on the previous schedule for years. This was devised as another form of retaliation to make it as hostile an environment as possible without actually, telling me to resign. It was a tactic I was a witness to, used against previous employee Ingrid Gomez, who resigned in 2016 after a change of schedule that proved to be temporary; the hours were changed back to normal after she left. With the new change of schedule, it made the PAX2/ West Coast shift's hours of operation end at 7:00pm. This

would prevent me from picking up my children form daycare before their closing time of 6:30PM on those days. There was no operational need to do so as the responsibilities of a daytime analyst did not require that late schedule, and there was always an on call analyst available at all times on rotation, to answer any questions or address any issues as they would come up. That day I also emailed Alan Fridman to verify that the results of the internal investigation had been turned over to the legal department because I had not received notification from Human Resources about the results of the investigation.

65.     On September 14, 2021, I met with Miriam Rodriguez, a licensed Mental Health Therapist to talk about the situation and try to help me cope (Exhibit #71).

66.     On September 15, 2021, I met with Alan Fridman, upon his request, hoping to finally get the results of the investigation because neither human resources nor the legal department had responded to my letters or my calls regarding the investigation. He told me the reason they did not respond was that he was the company's point of contact regarding the matter, and that he would be turning additional results to Helen Warner from the legal department (again not giving me the results of the investigation) (Exhibits #2, 52, 73). Human Resources lied to me when, through Isabel Zuluaga, they communicated the investigation was being mandated as a response to my request for a written explanation. She said at the conclusion of the investigation I would be given the results. The conclusion of the investigation had arrived, and the results had been turned in to the legal department, but I was not given any notification of the findings that they promised I'd receive. Mr Fridman reached out to inquire about questions I raised in a letter requesting the results of the investigation, and at that point I realized his intention was never to reach the truth, but was created as a fact finding mission to find out what evidence I had to

support the case. I also realized that the investigation was extended to delay any resolution by the EEOC while I confronted the hostile actions directed against me every day, perpetuating the psychological toll of the situation. Management was now also ignoring my presence in team meetings when consecutively greeting the individual members of the team and avoiding any type of communication with me. In this call Mr Fridman advised that the reason for the treatment I was getting from management was that I was considered an adversary of the company. Alan Fridman also stated that he was my only point of contact regarding the investigation and would not provide the results of the investigation to me. Helen Warner was the recipient of the results but was not answering phone calls from me and it became clear they were under instructions to limit all communications with me, and stall any information regarding the investigation, as I was considered an adversary of the company.

67. Having exhausted all available measures known to me to address the discrimination I was facing, realizing that nothing was going to improve or change, as a result of the intolerable work environment I was being subjected to and could no longer face, I was forced to resign on September 15, 2021.

68. Because of LATAM AIRLINES' unlawful conduct, Mrs. Gonzalez was harmed and suffered damages.

69. The unlawful employment practices complained of in paragraphs 25-61, after I reported I was pregnant again, were intentional.

70. The unlawful employment practices complained of in paragraphs 25-64 were done with malice or with reckless disregard for my federally protected rights because of my gender and pregnancy.

71. Plaintiff respectfully requests that this Honorable Court take Judicial Notice of the case of EVELYN PIRES LOPES, Plaintiff, v. LATAM AIRLINES GROUP S.A. INC. and

PROFESSIONAL AIRLINE SERVICES, INC. a/k/a Professional Aviation Management, Inc. d/b/a The Professional Group, Defendants: *Case 1:21-cv-20718-XXXX Document 1 Entered on FLSD Docket 02/22/2021.*

72.     Plaintiff also requests that this Honorable Court take Judicial Notice of the additional filing by Plaintiff in the New York Bankruptcy case LATAM Airlines Group S.A., *Case No. 20-11254.* Plaintiff has submitted her initial claim for damages as a New Claimant that had not been included previously because this claim did not arise until after the bankruptcy proceedings had begun.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendants, their successors, assigns, agents, servants, employees, and all persons in active concert or participation with them, from engaging in employment practices that discriminate on the basis of sex and pregnancy.

B.     Order Defendants to make whole Mrs. Lina Gonzalez De La Pava by providing compensation for past and future pecuniary and non-pecuniary losses resulting from the unlawful employment practices contained of herein, including but not limited to emotional pain, suffering, depression, inconvenience, mental anguish, embarrassment, degradation, humiliation, and loss of enjoyment of life, in amounts to be determined at trial.

C.     Order Defendants to pay Plaintiff punitive damages for their malicious and reckless conduct described herein, in amounts to be determined at trial.

D.     Grant such further relief as the Court deems necessary and proper in the public interest; and

E.     Award the Plaintiff her costs for this action.

## JURY TRIAL REQUESTED

Plaintiff requests a jury trial on all questions of fact raised by its complaint.

**Respectfully submitted,**

Lina M Gonzalez De La Pava. *Pro Se*

**Plaintiff has been assisted by her husband Hector Santiago who is not a lawyer yet researched and copied forms and format from similar cases**